**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LORRAINE GONZALES, | § | |
| *Plaintiff* | § | |
| | § | SA-23-CV-00694-XR |
| -vs- | § | |
| | § | |
| ROLAND SANCHEZ *et al.* | § | |
| *Defendants* | § | |

## ORDER ON REPORT AND RECOMMENDATION

On this date the Court considered (1) United States Magistrate Judge Henry J. Bemporad's Report and Recommendation in the above-numbered and styled case, filed September 29, 2023 (ECF No. 20), concerning Defendants' motion to dismiss (ECF No. 15), (2) Plaintiff's response (ECF No. 22) and various supplemental filings (ECF Nos. 24–27) and (3) Defendants' second motion to dismiss (ECF No. 29). After careful consideration, the Court issues the following order.

## BACKGROUND

Plaintiff, proceeding *pro se*, originally filed this action in the 81st District Court in Atascosa County, Texas. ECF No. 1-1 at 3. In her original complaint, Plaintiff appears to allege that she is a disabled person residing in Pleasanton, Texas (the "City"), and that City officials, including the Mayor, the former Chief of Police, and others, failed to respond properly to her calls for aid during a domestic-violence incident in July 2019 and her subsequent complaints about the incident. Plaintiff also alleges that she was unlawfully arrested and detained in September 2021, while she was protesting Pleasanton's domestic violence practices in front of City Hall. *Id.* at 5. When police approached Plaintiff, who was naked, she held a gun to her neck and threatened to shoot herself. Thereafter, Plaintiff was involuntarily detained at a mental health facility and then held in pretrial confinement in Atascosa County for 90 days. As relief, Plaintiff seeks damages of $500,000 and a "time served" sentence of 90 days. *Id.*

I.       **Removal, Supplemental Filings, and Defendants' First Motion to Dismiss**

Because Plaintiff's complaint appeared to assert claims under the U.S. Constitution and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, Defendants removed the case to this Court based on federal question jurisdiction. ECF No. 1 at 4.

After the case was removed, Plaintiff filed additional documents as amendments or supplements to her complaint, each attaching numerous documents and photographs as exhibits. *See* ECF Nos. 5, 7, 14. The first document contains medical records from 2019 and 2021, letters from the former Chief of Police in 2019 and 2021 addressing Plaintiff's complaints against an officer with the Pleasanton Police Department ("PPD"), and additional factual allegations regarding her psychiatric detention and incarceration in 2021. *See* ECF No. 5. The second document appears to refer to, among other things, an employment dispute with the City from 2006, a claim of sexual harassment against the Chief of Police, and the improper removal of service dogs from her home. *See* ECF No. 7 at 1–2. The third document appears to allege injuries that Plaintiff suffered while she was incarcerated. ECF No. 14.

In total, Plaintiff's pleadings appear to name twelve individual defendants ("Defendants"): former Chief of the Pleasanton Police Department ("PPD") Roland Sanchez; Assistant Chief Johnny Gonzales; PPD Officers Smitty Gonzales, Chris Treviño, Armando Rodriguez, David Daniel Zertuche, Ernest Guerra, and Rios Campos; Detective Jordan Lee Haren, Pleasanton Mayor Clinton J. Powell, City Secretary Andres Aguirre, and City Manager Johnny Huizar.

Defendants moved to dismiss Plaintiff's pleadings for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). ECF No. 15. In their motion, Defendants argued that Plaintiff failed to state a constitutional or ADA claim and that her state-law claims were precluded under the Texas Torts Claim Act, TEX. CIV. PRAC. & REM. CODE § 101.106(e). *Id.* at 5–

10. Defendants also contended that, to the extent they were being sued for constitutional violations in their individual capacities, they were entitled to qualified immunity. *Id.* at 5–8. The motion further asserts that Plaintiff "alleges some vague violations of the 8th Amendment" but "does not allege a violation of a clearly established right." *Id.* at 2.

In response, Plaintiff again asserted that City officials failed to respond properly to her allegation of domestic violence and, in particular, failed to provide her with a needed protective order against her estranged husband, allegedly in violation of the ADA and her Fourteenth Amendment rights to due process and equal protection. ECF No. 18 at 2. She also complained that the Mayor, City Manager, and Chief of Police were somehow responsible for her unlawful detention at the Laurel Ridge Treatment Center in San Antonio, Texas. *Id.* at 3.

## I.      Summary of Factual Allegations in Original Pleadings

In her original petition and supplements thereto and response to Defendants' motion to dismiss, Plaintiff alleges a lengthy and complex history of abuses by Pleasanton officials, which the Court attempts to summarize here.

Plaintiff worked for the City of Pleasanton in the Public Works Department from 2001 until her termination in 2006. Plaintiff was allegedly subject to sexual assault and harassment and discriminatory pay practices during her employment and received a settlement from the City of Pleasanton in 2009. *See* ECF No. 7 at 6; ECF No. 10 at 3; *see also Gonzales v. City of Pleasanton*, No. 04-08-00762-CV, 2009 WL 97557, at *1 (Tex. App.—San Antonio Jan. 14, 2009, no pet.) ("The appellant has filed a motion to dismiss this appeal in which she represents to the court that the parties have settled the controversy between them.").[1] From 2006 until 2019, Plaintiff served

---

[1] Plaintiff alleges that, as a part of the settlement, she had to agree that she would never work for the City of Pleasanton again nor run for City Council. *See* ECF No. 18 at 32.

as a correctional officer for the Texas Department of Criminal Justice. *See* ECF No. 5 at 9; ECF No. 14 at 3.

### A. Pleasanton Police Response to 2019 Domestic Violence Incident

In April 2019, Plaintiff suffered a stroke that impaired, among other things, her ability to speak and write. *See* ECF No. 5 at 9. Plaintiff was still recovering and homebound on July 30, 2019, when she was allegedly assaulted by her then-husband and then-caretaker, William Sifford III ("Sifford"). According to police reports attached to Plaintiff's filings, Sifford was preparing to move out of the house after filing for divorce. *Id.* at 26. Plaintiff alleges that Sifford had been drinking for days and had not been feeding or bathing her or taking her to doctor appointments. ECF No. 18 at 28. Sifford had allegedly ransacked her home looking for his teeth and wanted Plaintiff to sign documents transferring her home to him. ECF No. 7 at 16. When Plaintiff refused, he allegedly pushed Plaintiff down onto a glass table, which broke beneath her, causing injuries to her lower back. *See* ECF No. 1-1 at 5; ECF No. 7 at 16; ECF No. 14 at 4; ECF No. 18 at 23. He also allegedly turned off the power, which Plaintiff needed to operate the air conditioning and equipment she needed to manage her medical conditions. ECF No. 18 at 15.

PPD Officers Smitty Gonzales and Chris Trevino responded to Plaintiff's emergency call. Plaintiff asserts that she struggled to communicate with them due to her disability, that the Officers would not listen to her side of the story, and that they misrepresented in their police reports that both Plaintiff and Sifford agreed to separate for the evening without incident. Police reports indicate that Officer Gonzales noticed an injury on Plaintiff's chest. *See id.* at 24. When Officer Gonzales confronted Sifford about the injury, he stated that Plaintiff had shoved him several times as he was leaving the residence, but he did not want to pursue criminal charges given Plaintiff's recent health issues. *Id.*

The next day, Plaintiff went to the Police Station to request a protective order against Sifford. She alleges that she spoke with PDD Officers Ernest Guerra and Rios Campos, who agreed to send officers to Plaintiff's home for further investigation. *See id.* at 14. Plaintiff asserts that, although she requested a female officer, two days later, PPD Officers Armando Rodriguez and Daniel Zertuche were dispatched to her residence to photograph her injuries. She nonetheless permitted the male officers to photograph her body because they told her she would be unable to proceed with her request for a protective order without the pictures. *See* id. at 2.

Several days later, Plaintiff went to the Police Station to speak with Detective Haren, who had been assigned to investigate her case, to complain that he had not interviewed Plaintiff or her neighbors and that PPD had failed to send EMS or a "crisis interpreter" to the scene of the incident with her husband. Detective Haren allegedly threatened to put Plaintiff in jail, stating that he had enough evidence to arrest her for assaulting Sifford. *See id.* at 27–28.

During this conversation, Assistant Chief Johnny Gonzales approached Plaintiff and asked what was going on. She explained that she had been home bound for several months after suffering a stroke, that Mr. Sifford was neglecting her care and had physically assaulted her, and that she needed a protective order. *See id.* In response, Assistant Chief Gonzales allegedly reminded Plaintiff "how strong [she] was" and brought up the car she purchased with the settlement payment she received from the City in connection with her 2006 lawsuit. *Id.* He declined to issue a protective order but did report the situation to Adult Protective Services, which later conducted an independent assessment of Plaintiff's needs at her home.

On August 6, 2019, Detective Haren supplemented the police record with the findings of his investigation of the incident. *See id.* at 25–27. Detective Haren recommended that the case be suspended, concluding that probable cause "doesnt [sic] not appear evident, and it appears as if

Walter was defending himself while he was being pushed." *Id.* at 26. Detective Haren's report largely replicated Officer Gonzales's report, except that it stated that Officer Gonzales "did not see any injuries to Lorraine's upper body." *Id.* at 25 (emphasis added).

On September 9, 2019, Plaintiff submitted two complaints to the City of Pleasanton relating to the April 2019 domestic violence call—one against Officer Gonzales and another against Detective Haren, who allegedly closed the PPD investigation of the domestic violence incident. *See* ECF No. 7 at 11–14. She asserted that Gonzales "[did not] care that [she] had a stroke" and could not tell her story. *Id.* at 11. She also accused him of aiming his flashlight near her breasts and down her legs and looking at her body while she was wearing a nothing but a bathing suit. *Id.* at 12.

On November 7, 2019, former Chief of Police Roland Sanchez ("Sanchez"), who has known Plaintiff since 2001, sent Plaintiff a letter explaining that he had ordered an investigation into her complaint and, based on the results of the investigation, had concluded that her allegations were unfounded. ECF No. 5 at 7.

Plaintiff evidently submitted another complaint about Officer Gonzales at some point thereafter. In August 2021, Plaintiff alleges that she encountered Sanchez while she was dining with a friend at a local bar and grill. *See id.* at 3; ECF No. 7 at 10, 13. Sanchez allegedly approached her, touched her arm, called her by her first name, apologized for the delay in resolving her latest complaint, and promised to assign a new investigator to her case. *See id.*

On September 2, 2021, Sanchez sent Plaintiff a second letter—nearly identical to the first—explaining that he had ordered an investigation into her complaint and, based on the results of the investigation, had concluded that her allegations against Officer Gonzales were unfounded. ECF No. 5 at 7.

In August and September 2021, Plaintiff also sought to report her experience to City officials, including three named Defendants—Mayor Powell, City Secretary Aguirre, and City Manager Huizar—who allegedly refused to speak with Plaintiff (or limited her speech) about her concerns. ECF No. 18 at 15–16.

**B.  2021 Protest, Arrest, Hospitalization, Pretrial Detention, and Loss of Service Dogs**

On September 9, 2021, in response to the City's failure to respond to her complaints, Plaintiff stood naked in front of Pleasanton City Hall, holding a banner protesting the police department's treatment of domestic violence incidents. ECF No. 5 at 11. When police approached her, Plaintiff pulled a handgun from her purse, held it to her neck and threatened to shoot herself.[2] ECF No. 5 at 7; ECF No. 7 at 18.

Plaintiff was arrested at the scene, taken to the emergency room, and then involuntarily admitted to Laurel Ridge Treatment Center, where she was held for eleven days. Plaintiff asserts that, during her stay, she was not permitted contact with her family. She also alleges that a male patient tried to sexually assault her while she was in the shower.

On September 21, 2021, Plaintiff was released from Laurel Ridge to a San Antonio Police Department ("SAPD") officer, who took her to University Health. ECF No. 5 at 12. Plaintiff was given a written notice informing her that she was suspected of "Terroristic Threats" and should contact the Pleasanton PD to determine the status of any charges against her. ECF No. 7 at 19. After two hours, she was released from University Hospital but could not contact her family to pick her up because her phone had died. ECF No. 5 at 12. Uncertain about what to do next, Plaintiff left the hospital on foot. *Id.* She was allegedly suffering from incontinence at the time and had to

---

[2] Plaintiff later explained that the gun was unloaded, but she threatened to shoot herself because she was afraid that the officers would tase her and exacerbate her medical conditions. *See* ECF No. 5 at 11. She further alleges that Sanchez retaliated against her because of the prior complaints she made and her protest by "lying to the media" and describing her as "incoherent." ECF No. 18 at 16.

remove her shoes, which were filled with urine. *Id.* She walked, barefoot, to a nearby restaurant, where she managed to dry off. *Id.* Plaintiff then walked to the office of the doctor who was scheduled to perform Plaintiff's bladder and hernia surgery on September 24, 2021. *Id.* At the doctor's office, Plaintiff called a friend—the emergency contact listed in her file—to let her know that she planned to quarantine in a hotel until surgery. *Id.*

After the surgery, Plaintiff called the Pleasanton PD and learned that a felony warrant had been issued for her arrest. Plaintiff was taken into custody and confined at the Atascosa County Jail for 90 days. Plaintiff alleges that she had no access to her medications during her confinement and was held in a cell in which her only access to water was through a single button that dispensed very hot water from a shower.[3] In October 2021, she fell in the shower and was left under scalding water for about three hours. The shower reopened the abdominal wound from her recent hernia surgery, which then became infected. ECF No. 5 at 13; ECF No. 14 at 3–4.

During Plaintiff's confinement, her service dogs were removed from her home by an unidentified animal control officer who purported to be responding to citizen complaints about the dogs. *See* ECF No. 7 at 20. Plaintiff's son, who moved in with her in September 2019, cooperated with the officer because he was unsure how to respond but noted that he never received any documentation explaining why the dogs were being seized. *See id.* The dogs have not been returned. *See* ECF No. 5 at 13; ECF No. 7 at 1–2. Plaintiff was released from jail on January 21,

---

[3] Plaintiff alleges that, during her time at Laurel Ridge, she had to take multiple showers per day due to her incontinence. *See* ECF No. 18 at 3. It is worth noting that Plaintiff was ultimately discharged from Laurel Ridge—a mental health facility—because the staff determined that it could not manage Plaintiff's various health conditions. *See* ECF No. 27 at 2. Moreover, after the initial domestic violence incident in 2019, Assistant Chief Gonzales allegedly informed Plaintiff that "from [his] experience the jail doesn't usually like to accept people with disabilities to be locked up in jail because it is not a safe place to be in." ECF No. 18 at 27. It is not clear to the Court who determined that the Atascosa County jail would be better able to serve Plaintiff's medical needs than Laurel Ridge Treatment Facility.

2022. *See* ECF No. 18 at 13. She asserts that, to date, she has not been indicted and her dogs have not been returned. *See* ECF No. 5 at 13; ECF No. 7 at 1–2.

### C.  2022–2023 Criminal Trespass Warnings

The day before Plaintiff was released from jail, the Pleasanton City Council issued a resolution, signed by Mayor Powell and City Secretary Aguirre, authorizing the City Manager and designees "to enact and enforce a trespass policy excluding criminal trespassers, trespassers, and any persons engaging in disruptive, illegal or harmful activities from City Property, buildings and facilities" and to issue criminal trespass warnings. ECF No. 18 at 4–6.[4]

Under the trespass policy, officers are typically required to issue a verbal warning and afford the offending party an opportunity to comply before giving a written warning. *See id.* at 7. The policy permits an officer to issue a written trespass warning *without* a verbal warning if the person has engaged in conduct that is unreasonably disruptive or harmful to City Property, to conducting City business, or to another's reasonable use and enjoyment of approved activities on City Property, and that may:

> a. Be a state or federal criminal offense or ordinance violation or is an attempt, solicitation or conspiracy to commit a state or federal criminal offense or ordinance violation . . .; or
>
> b. Have resulted in injury to any person or damage to any property, or threaten to cause an immediate breach of the peace.

*Id.* at 7–8. A written warning must include, among other things, (a) the reasons for exclusion from the public building or area, (b) a description of the area or building that the person cannot enter, (c) a statement of the duration of exclusion, and (d) a warning that reentry may result in the

---

[4] Plaintiff attached a copy of City's resolution and policy to her response to Defendants' motion to dismiss. *See* ECF No. 18 at 4–9.

person's arrest. *Id.* at 8. A warning may result in exclusion from the property for up to 365 days—and up to two years, if the person has received a warning in the previous two years. *See id.* at 8–9.

Plaintiff's supplemental filings include five trespass warnings issued by Pleasanton officials. *See id.* at 10–12. The first three were issued by PPD Officer Daniel Zertuche on September 10, 2021—the day after Plaintiff's protest and arrest—and excluded Plaintiff from three addresses in Pleasanton, including the Police Station. *See id.* at 10–11. The other two trespass warnings we issued by PDD Officer Daisy Herrera in February 2022, just days after Plaintiff's release from prison and the adoption of the new criminal trespass policy. *See id.* at 11–12.[5] Officer Herrera's warnings indicate that Plaintiff is excluded from "all city owned property" until February 2025. *See id.* Plaintiff correctly points out the second warning purports to exclude her from two addresses, one of which—1101 North Bryant—is Plaintiff's own home address (and presumably not owned by the City of Pleasanton).

## II.    The Magistrate Judge's Recommendation

The Court referred Defendants' motion to Magistrate Judge Bemporad, who issued his report and recommendation on September 29, 2023. ECF No. 20.

The Magistrate Judge recommended that that the ADA and constitutional claims premised on Defendants' inadequate response to the domestic violence incident be dismissed for failure to state a claim. He recommended that Plaintiff's ADA claims be dismissed because "her complaint fail[ed] to plausibly allege facts to show that the police response to the domestic violence incident was intentionally discriminatory [on the basis of her disability]." *Id.* at 5. The Magistrate Judge also noted that the officers' alleged failure to protect Plaintiff from assault despite her disability did not state a due process violation. *Id.* (citing *DeShaney v. Winnebago Cnty. DSS*, 489 U.S. 189,

---

[5] Officer Herrera has not been named as a Defendant in this action.

196–97 (1989) ("[A] State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause.")). While such a failure could show a violation of equal protection, Plaintiff had not plausibly alleged that she was selectively denied protective services due to her constitutionally protected status. *See id.* (citing *DeShaney*, 489 U.S. at 197 n.3).

With respect to her alleged wrongful detention at Laurel Ridge, the Magistrate Judge recommended that her claims against the Defendant Mayor, Police Chief, and City Manager be dismissed because Plaintiff failed to how any of those individuals were personally involved in her confinement, let alone how the confinement violated the Constitution. *Id.* at 5–6 (citing *see Jones v. Lowndes Cnty., Miss.*, 678 F.3d 344, 349 (5th Cir. 2012) (Section 1983 claimant must establish that defendant was either personally involved in deprivation or that his wrongful actions were causally connected to deprivation)).

Finally, the Magistrate Judge concluded that Plaintiff's remaining claims—premised on the abduction of her service dogs, creation of false police reports, sexual harassment, and perhaps employment discrimination—could not survive Defendants' Rule 12(b)(6) motion because they failed to allege violations of law in anything but a conclusory fashion. *Id.* at 6. The Report and Recommendation did not specifically address Plaintiff's claim for violation of her Eighth Amendment right to be free from cruel and unusual punishment or her state-law claims.

In light of Plaintiff's *pro se* status, the Magistrate Judge recommended that she be permitted an opportunity to file an amended complaint curing the deficiencies in her original pleadings. *See id.* He nonetheless recommended that Plaintiff be required to seek leave to file her amended complaint and that her proposed amended complaint should be limited in length and should not include attachments. *Id.* at 7. Finally, he advised that "[a]s to any § 1983 claim, the proposed amended complaint must contain the minimal facts sufficient to meet the standards of Federal

Rules of Civil Procedure 8 and 12(b)(6), and to overcome Defendants' proffered qualified immunity defense. *Id.*

## III.     Plaintiff's Responses to the Magistrate Judge's Recommendations

Plaintiff filed a response to the Magistrate Judge's Report and Recommendation on October 19, 2023. *See* ECF No. 22; *see also* ECF Nos. 24–27 (supplemental responses). Although the filing was timely, it does not "specifically identify" any objections. Rather, based on the heading of the document—"PLAINTIFF IS FILING A PLEADING IN FEDERAL COURT"— and numerous references to her intent to "amend her complaint," the Court construes the filing as a motion for leave to file an amended complaint and the subsequent filings as motions for leave to supplement the operative pleading, all of which are granted.

## IV.     Summary of Factual Allegations in Plaintiff's Amended Pleadings

Plaintiff's Amended Complaint and supplemental filings include a "Psychiatric Evaluation" dated September 22, 2021, describing the events leading to her involuntary admission to Laurel Ridge. ECF No. 26 at 6, 8. After twelve days at Laurel Ridge, the staff determined that Plaintiff was of sound mind and, because they did not have adequate means to handle Plaintiff's various physical ailments, they contacted the SAPD to arrest Plaintiff for an outstanding felony warrant in Pleasanton. ECF No. 27 at 2. Rather than transporting Plaintiff to jail, SAPD Officer Joshua Torres, on orders from his supervisor, transported her to the University Hospital for medical clearance.[6] *Id.* Officer Torres stated in his report he was instructed to wait for two hours at the hospital and, if Plaintiff was not released, to advise hospital staff to contact the PPD. *Id.* Officer Torres left the University Hospital after two hours passed. *Id.*

---

[6] Officer Torres has not been named as a Defendant in this action.

Plaintiff alleges that she has not been indicted for her 2021 protest but remains excluded from public life in Pleasanton, including access to many social services, because of the no-trespass orders. ECF No. 22 at 7–8. For example, following her stroke, Plaintiff has had to teach herself to read again using library computers. To continue with her reading program—and to prepare her various court filings here—Plaintiff must drive to a nearby library instead, because she is barred from entering the Pleasanton Library. *Id.* She asserts that she was denied entry to City Hall to pay her utility bills and was ultimately forced to put her house in her son's name. She was likewise denied entry at Animal Control when she tried to locate the service dogs that were removed from her home. *Id.* Aside from the loss of access to these community services, she has lost the enjoyment of going to the riverside park with her family and friends. *Id.*

As Plaintiff puts it, "Ostraciz[ation] is a form of punishment which is only possible in small town, where almost everyone know[s] each other." *Id.* at 9. As one example, Plaintiff alleges that a City Councilman, Joey Macon, sent the police to the local gym he owned to serve Plaintiff with the warning extending her no-trespass order to February 2025. Macon allegedly remarked that he wished he could add his address to the no-trespass order because "nobody wants you here." *Id.*

## V.    Defendants' Second Motion to Dismiss

In February 2024, Defendants moved to dismiss Plaintiff's Amended Complaint and supplemental filings for failure to state a claim against the Officers that could overcome their qualified immunity defense:

> Plaintiff, in her Amended Complaint, as supplemented, asserts a variety of complaints, many of which do not identify a government official from the City of Pleasanton and named as a Defendant herein that committed a violation of law, and others that do not assert a proper basis concerning a clearly established constitutional right.

ECF No. 29 at 4–5.

**DISCUSSION**

## I.   Legal Standards

### A.  Standard of Review of Magistrate Judge's Recommendations

A party may serve and file objections to a Report and Recommendations within fourteen days. FED. R. CIV. P. 72(a), (b)(2). "Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive [sic] or general objections need not be considered by the district court." *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982), *overruled on other grounds by Douglass v. United States Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

Courts must review *de novo* any of the Magistrate Judge's conclusions to which a party has specifically objected. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). Any sections that were not clearly objected to are reviewed for clear error to determine whether they are contrary to law. *Id.*; *see also United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989), *cert. denied*, 492 U.S. 918 (1989).

### B.  Rule 12(b)(6) – Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain

statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain a recovery") (internal quotation marks and citations omitted).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences favorable to the plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions.").

When reviewing a *pro se* plaintiff's complaint, the Court must construe the allegations liberally, holding the *pro se* to less stringent pleading standards than those applicable to lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). When evaluating the claims of a *pro se* litigant like Plaintiff, a court is to determine whether

"within the universe of theoretically provable facts there exists a set which can support a cause of action under this complaint, indulgently read." *Covington v.* Cole, 528 F.2d 1365, 1370 (5th Cir. 1976). Even so, a party's *pro se* status does not offer him "an impenetrable shield, for one acting *pro se* has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets." *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986).

## II. Analysis

Despite Plaintiff's sweeping complaints about Pleasanton officials' conduct, allegations against the named Defendants specifically are scarce. The factual allegations against each Defendant, addressed below, are largely unclear and conclusory.

- **Officers Smitty Gonzeles and Chris Trevino**: Plaintiff alleges that PPD Officers Gonzales and Trevino engaged in disability discrimination by failing to obtain a protective order on her behalf in connection with the domestic violence incident and failing to call emergency services or a "crisis interpreter" while they were responding to the call. ECF No. 18 at 15, 28.

- **Officer Ernest Guerra**: Plaintiff alleges that Guerra "had his officer's [sic] refusal of a Protective order." ECF No. 22 at 5.

- **Officers Rios Campos, David Zertuche, and Armando Rodriguez**: Plaintiff alleges that these officers "[took] picture's [sic] of my body front and back with out a female officer present, and noted that I would not get the Protective order with out the pictures." *Id.*

- **Detective Jordan Lee Haren**: Plaintiff alleges that Haren "knowingly chang[ed] the officer Gonzales # 1582 officer saw injury to Lorraine's upper body" and failed to investigate her domestic violence complaint.

- **Assistant Chief Johnny Gonzales failed** to investigate her domestic violence claim or her complaints about the other officers assigned to her case.

- **Mayor Clinton Powell, City Secretary Andres Aguirre, and City Manager Johnny Huizar**: Plaintiff alleges that City officials have denied her benefits of municipal programs and services by barring her from property owned by the City of Pleasanton until 2025. ECF No. 22 at 7. She also alleges that the officials have been unresponsive to her complaints about the initial investigation into her domestic violence call in 2019.

- **Roland Sanchez**: Plaintiff complains that Sanchez failed to investigate her complaints against the officers involved in her 2019 domestic violence case and orchestrated the removal of her service dogs from her home while she was incarcerated and her exclusion from City property following her release.

Many of Plaintiff's allegations are complaints in search of a claim. For example, Plaintiff alleges that Officer Gonzales looked at her with a flashlight, that Sanchez touched her arm and used her first name and later removed her service dogs from her home. She does not, however, explain how any of this conduct allegedly violated her civil rights.

On the other hand, in a few instances, Plaintiff alleges conduct that could plausibly state a claim for violation of her civil rights without naming the Defendant who allegedly violated her rights. For example, Plaintiff fails to identify the officials who were responsible for supervising the conditions of her cell and medical care during her incarceration. The circumstances around Plaintiff's exclusion from City property are equally unclear.

### A.  Plaintiff's ADA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "disability" is "a physical or mental impairment that substantially limits one or more major life activities[.]" *Id.* § 12102(1)(A). "Public entities" include States, local governments, and their agencies and instrumentalities. *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020) (citing 42 U.S.C. § 12131(1)(A)). Title II's protections extend to all services, programs, and activities of public entities. 42 U.S.C. § 12132.

To state a claim under for disability discrimination under Title II of the ADA, Plaintiff must allege that:

(1) she is a "qualified individual" with a disability under the ADA;

(2) she was or is being excluded from participation in or denied the benefits of services, programs, or activities for which the public entities are responsible, or are otherwise being discriminated against by the public entities; and

(3) the exclusion or discrimination was by reason of her disability.

*See Luke v. Texas*, 46 F.4th 301, 305 (5th Cir. 2022); *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004) (citing *Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997)). A plaintiff can recover monetary damages under the ADA only if she also proves that the discrimination was intentional. *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020); *Delano-Pyle v. Victoria Cnty, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).

### 1. Failure to Protect – Officers' Response to Domestic Violence Call

The Magistrate Judge recommended that any ADA claims premised on the police response to the domestic violence incident be dismissed because "her complaint fail[ed] to plausibly allege facts to show that the police response to the domestic violence incident was intentionally discriminatory [on the basis of her disability]." ECF No. 20 at 5.

Because Plaintiff's failed to specifically object to the Magistrate Judge's recommendations concerning her ADA claims, they are reviewed for clear error to determine whether they are contrary to law. *Wilson*, 864 F.2d at 1221; *Nettles*, 677 F.2d at 410 n.8. The Court has reviewed the Report and Recommendation and finds it to be neither clearly erroneous nor contrary to law.

Although police reports suggest that the PPD Officers involved in the response to the domestic violence incident in 2019 were aware of Plaintiff's condition and perceived that she had trouble communicating, nothing in the operative pleadings suggest that Plaintiff was denied a protective order due to intentional discrimination on the basis of her disability. Rather, it appears that Assistant Chief Gonzales concluded that "it [was Plaintiff's] word against [Sifford's] and that

there [was] no physical evidence, bruises or injuries showing that either party was assaulted." ECF No. 18 at 27.

Accordingly, the Court **ADOPTS** the Magistrate Judge's recommendation to dismiss Plaintiff's claims under the ADA, and Defendants' motion to dismiss (ECF No. 15) is **GRANTED**.

### 2. Disability Discrimination – Exclusion from Public Services

Plaintiff's exclusion from Pleasanton property, on the other hand, *does* appear to be intentional. And Plaintiff is certainly being "excluded from participation in or denied the benefits of services, programs, or activities" for which the City of Pleasanton is responsible. *See Luke*, 46 F.4th at 305. Still, to the extent that it is actionable, the no-trespass order does not state a claim under Title II of the ADA, because there are no factual allegations suggesting that PPD Officers issued the no-trespass orders against Plaintiff *because of* her disability. Rather, they appear to stem from either her actions or some hostility against Plaintiff individually. Accordingly, all of Plaintiff's ADA claims are **DISMISSED**.

### B. Plaintiff's § 1983 Claims for Constitutional Violations

Section 1983 requires a plaintiff to allege that she has been deprived of a federal right and that the person who deprived her of that right acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

### 1. Legal Standards for Individual and Municipal Defendants

#### a. Individual Officers - Qualified Immunity

Qualified immunity protects public officials from suit and liability for damages under § 1983 unless their conduct violates a clearly established constitutional right. *Mace v. City of Palestine,* 333 F.3d 621, 623 (5th Cir. 2003). In addressing whether qualified immunity applies, courts engage in a two-step inquiry, determining (1) whether a federal statutory or constitutional

right was violated on the facts alleged; and (2) whether the defendant's actions violated clearly established rights of which a reasonable person would have known. *Id.* at 623–24. The two steps of the qualified-immunity inquiry may be performed in any order. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

Under the second step of the inquiry, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (citations, quotation marks and alteration marks omitted). The Court does not need "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Clearly established law is not determined "at a high level of generality." *Id.* at 742. Instead, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna,* 577 U.S. 7, 12 (2015) (citation and emphasis omitted). The inquiry must look at the specific context of the case. *Id.*

Still, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quotations and alteration marks omitted) (finding an "obvious" violation of the Eighth Amendment prohibition against cruel and unusual punishment where subdued inmate was handcuffed to a hitching post for hours, subjecting him to a substantial risk of physical harm, unnecessary pain, unnecessary exposure to the sun, prolonged thirst and taunting, and a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation"). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the

precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (internal quotations and citation omitted). Thus, an officer violates clearly established law when his conduct so obviously transgresses the Constitution such that the unlawfulness would have been apparent to any reasonable officer.

### b. City of Pleasanton – *Monell* Liability

Although none of Plaintiff's pleadings appear to name the City of Pleasanton as a defendant, some of her allegations suggest that she seeks to recover from the City. For example, Plaintiff asserts that there are "patterns and practices [and] systemic issues" in how the City handles domestic violence cases and that the incident with her ex-husband in 2019 was not an isolated event. ECF No. 7 at 9. Here, Plaintiff points to a 2019 report indicating that the family violence crime rate was rising in both Bexar County and Atascosa County. *See id.* at 7–8. At the same time, in contrast with Texas generally, the percentage of completed investigations of such cases in both counties decreased between 2010 and 2018. *See id.* at 8.

The Supreme Court made clear long ago that a local governmental entity can only be held liable under Section 1983 for constitutional harms that are directly attributable to the governmental entity itself. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). Accordingly, a plaintiff suing a municipality under Section 1983 must show that "the municipality has a policy or custom that caused plaintiff's injury." *Crull v. City of New Braunfels*, 267 F. App'x 338, 342 (5th Cir. 2008) (citing *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)). "The plaintiff must identify the specific policy or custom, and show that the final policy maker, through its 'deliberate

conduct,' was the 'moving force' behind the violation." *Crull*, 267 F. App'x at 342 (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)). "The description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)).

Acts of individual municipal employees do not create liability under Section 1983 unless a policymaker has adopted a policy or custom that resulted in a constitutional violation. *See Pineda v. City of Hous.,* 291 F.3d 325, 328 (5th Cir. 2002). A plaintiff can show a policy arising from written policy statements, ordinances, or regulations. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Because it is very unlikely that a plaintiff will document proof of unconstitutional policy or disposition, however, the policy or custom may be inferred circumstantially from conduct. *Grandstaff v. Borger*, 767 F.2d 161, 171 (5th Cir. 1985). Thus, a plaintiff can show a policy by a custom, that is, "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Bennett*, 735 F.2d at 862. Finally, a "single decision" may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim." *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)).

Whatever its form, to yield municipal liability under § 1983, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694). "In other words, a plaintiff must show direct causation, i.e., that there

was 'a direct causal link' between the policy and the violation." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009).

To the extent that Plaintiff seeks to assert a *Monell* claim against the City, it is deficient in several respects. First, Plaintiff has not identified a policymaker responsible for the City's alleged policy or practice of failing to properly investigate allegations of domestic violence. Nor does she explain how such a policy violated her constitutional rights. *Piotrowski*, 237 F.3d at 580. It is unclear whether Plaintiff is alleging that the City's approach to domestic violence cases violated her equal protection rights, due process rights, or some other constitutional right. Accordingly, any section 1983 claim against the City is **DISMISSED**.

### 2.   Fourteenth Amendment – Due Process Clause

#### a.   Officers' Response to Plaintiff's Domestic Violence Call in 2019

Plaintiff's claim that officers failed to protect her from assault despite her disability does not allege a due process violation.[7] *See DeShaney*, 489 U.S. at 196–97 ("[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). Any such claim is **DISMISSED**.

#### b.   Failure to Investigate Plaintiff's PPD Complaints

The Court observes that well settled jurisprudence under 42 U.S.C. § 1983 establishes that supervisory officials cannot be held vicariously liable for the actions of their subordinates. *Mouille v. City of Live Oak, Tex.*, 977 F.2d 924, 929 (5th Cir. 1992). Personal involvement is an essential element of a civil rights cause of action. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

---

[7] The Court further observes that any such claims would by time-barred. The statute of limitations for claims brought under Section 1983 is determined by looking to the forum state's limitations period for personal-injury torts. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Texas, the statute of limitations for a Section 1983 claim is two years. *Piotrowski*, 237 F.3d at 576. Although the alleged violations of Plaintiff's rights occurred in July 2019, Plaintiff did not file her initial complaint in this case until April 2023. *See* ECF No. 1-1 at 3.

Supervisory officials may be held liable if they: 1) affirmatively participate in the acts that cause the constitutional deprivation; or 2) implement unconstitutional policies that causally result in the plaintiff's injury. *Mouille*, 977 F.2d at 929.

Because Plaintiff has failed to allege any personal involvement by Chief Sanchez in the response to her domestic violence call in 2019, her arrest in 2021, or the conditions of her subsequent hospitalization and detention, the personal involvement requirement with respect to those claims has not been met. Any such claim against Chief Sanchez in this regard is **DISMISSED**.

Likewise, with respect to municipal liability, "the mere failure to investigate a police officer's conduct that allegedly violated a person's . . . rights cannot amount to ratification." *Khansari v. City of Houston*, 14 F. Supp. 3d 842, 871 (S.D. Tex. 2014); *see Coon v. Ledbetter*, 780 F.2d 1158, 1161–62 (5th Cir. 1986) (noting that ratification precedent in the Fifth Circuit "does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy").

Finally, in the event that Plaintiff seeks to assert a "state-created danger" theory of liability, the Court observes that such a claim would fail, for several reasons. The Fifth Circuit has yet to adopt the state-created danger theory, but has reasoned that such a claim would require a showing that "[1] the defendants used their authority to create a dangerous environment for the plaintiff and [2] that the defendants acted with deliberate indifference to the plight of the plaintiff." *Doe v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 865 (5th Cir. 2012) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537–38 (5th Cir. 2003)).

Although Plaintiff insists that Defendants' indifference to her domestic violence allegations increased the risk that Sifford would commit future acts of violence, she does not allege that she suffered any further injuries from Sifford because her request for a protective order was denied or because City Officials failed to investigate her complaints. Further, given the Fifth Circuit's refusal to recognize a state-created-danger theory in its § 1983 jurisprudence, the Court cannot conclude that the law was clearly established when Plaintiff's requests for a protective order and for further investigation into her complaints were denied. All claims against all defendants premised on this claim are **DISMISSED**.

### c. Involuntary Detention and Treatment at Laurel Ridge

Plaintiff challenges her detention at Laurel Ridge Treatment Center as somehow unlawful, presumably under the due process clause of the Fourteenth Amendment. She asserts that Sanchez was responsible for her detention, ECF No. 22 at 10, but fails to allege any facts connecting him to her detention. These conclusory assertions are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Thus, Plaintiff has not alleged sufficient to overcome Defendants' qualified immunity or to show personal involvement in any alleged constitutional violation. *See* ECF No. 20 at 5–6 (citing *Jones*, 678 F.3d at 349).

Moreover, the Court observes that the medical records attached to one of Plaintiff's supplemental filings confirm that she was taken to University Hospital Emergency Department before her admission to Laurel Ridge. *See, e.g.*, ECF No. 26 at 6. Thus, although she appears to have been transported from University Hospital to Laurel Ridge by the PPD, it is likely that she was transferred to Laurel Ridge based on a medical evaluation rather than at the direction of Sanchez or any other PPD officer. Likewise, Plaintiff's complaints about the conditions of her

detention at Laurel Ridge should be directed at Laurel Ridge staff rather than PPD officers or City officials.

Accordingly, Plaintiff has failed to state a § 1983 claim for violation of her Fourteenth Amendment due process rights in connection with her involuntary detention at Laurel Ridge. All claims against any defendant premised on Plaintiff's stay at Laurel Ridge are **DISMISSED**.

### d.  Seizure of Service Dogs

Plaintiff alleges that her service dogs were unlawfully seized from her home without a warrant in October 2021, during her incarceration, presumably in violation of her due process rights under the Fourteenth Amendment. She asserts that Chief Sanchez was "in charge of the Animal Control Officers." ECF No. 18 at 13.

It is true that, under certain circumstances, Texas law assigns animal control authority to the local police department, *see, e.g.*, TEX. HEALTH & SAFETY CODE § 822.012(b). Still, Plaintiff has not identified any specific conduct attributable to Sanchez individually suggesting that he was personally involved in the removal of her dogs from her home. Nor has she identified the Animal Control officers who actually seized her dogs.

Accordingly, Plaintiff's has failed to state a § 1983 claim for violation of her Fourteenth Amendment due process rights in connection with Pleasanton Animal Control's seizure of her service dogs.

### e.  Conditions of Plaintiff's Pretrial Confinement

Plaintiff seems to complain about a denial of adequate medical care while she in a 90-day confinement at the Atascosa County jail, including her fall in the shower and related injuries. *See* ECF No. 5 at 13.

The Constitution requires humane conditions of confinement, including, for example, the receipt of adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Although a convicted prisoner's right to humane conditions of confinement springs from the Eighth Amendment's prohibition on cruel and unusual punishment, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), a pretrial detainee's rights arise under the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979) ("The constitutional rights of a pretrial detainee . . . flow from [] the procedural and substantive due process guarantees of the Fourteenth Amendment[.]"); *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) (federal pretrial detention); *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (state pretrial detention). As a practical matter, however, there is "no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." *Gibbs*, 254 F.3d at 548. Accordingly, the same standards apply under both amendments. *Id.* When the alleged unconstitutional conduct involves an episodic act or omission, the question is whether the state official acted with deliberate indifference to the inmate's constitutional rights, regardless of whether the individual is a pretrial detainee or state inmate. *Id.*

To prove deliberate indifference, a pretrial detainee must show that the state official knew of and disregarded an excessive risk to the inmate's health or safety. *Id.* Deliberate indifference can be proven via circumstantial evidence, "and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004); *see, e.g.*, *Farmer*, 511 U.S. at 847 (holding that a prison official is deliberately indifferent "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it" (emphasis added)); *Austin*

*v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (denying qualified immunity where, although a prison guard rendered first aid, the minor-aged prisoner remained unconscious and vomiting due to heat stroke and the guard waited nearly two hours to call for emergency services); *Taylor*, 592 U.S. at 8 (holding that prisoner's right not to be held in "deplorably unsanitary conditions" two cells—one covered in massive amounts of feces and the other frigidly cold with a clogged drain overflowing with raw sewage—was so obvious that "no reasonable correctional officer could have concluded [that the conditions were] constitutionally permissible.").

Assuming Plaintiff was suffering from various ailments while at the jail, Plaintiff has not adequately alleged "deliberate indifference" because she has failed to explain how any of the named Defendants were personally involved in the violation of her right to humane conditions of confinement. *See Jones,* 678 F.3d at 349 (Section 1983 claimant must establish that defendant was either personally involved in deprivation or that his wrongful actions were causally connected to deprivation). To cure this deficiency, Plaintiff must specifically identify the official(s) who allegedly knew of and disregarded an excessive risk to her health or safety, leading to her fall in the shower and a subsequent infection.

### 3. Fourteenth Amendment – Equal Protection Clause

The Court agrees with the Magistrate Judge that Plaintiff has failed to plausibly allege that she was selectively denied protective services due to her constitutionally protected status. ECF No. 20 at 5 (citing *DeShaney*, 489 U.S. at 197 n.3). Plaintiff's equal protection rights under the Fourteenth Amendment fails because she does not identify herself as a member of a protected class or allege that she was intentionally treated differently than any similarly situated comparator. *Id*.

Plaintiff's filings suggests that she may intend to assert a "class of one" claim. *See* ECF No. 22 at 9 ("Ostracize [sic] is a form of punishment which is only possible in small town, where

almost everyone know[s] each other[.]"). While equal protection claims typically involve intentional discrimination against a protected class—race, sex, alienage, or some other immutable characteristic—the Supreme Court has recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (collecting cases).

Much of the treatment outlined in Plaintiff's pleadings could theoretically support a "class of one" claim if she could identify responsible actors and appropriate comparators, including the denial of protective services, her arrest and detention, the removal of her dogs, and her exclusion from public buildings in Pleasanton.[8] But Plaintiff has not alleged any facts showing that she was treated differently from similarly situated citizens—e.g., other victims of domestic violence, other citizens with disabilities, or others who had threatened to shoot themselves while standing naked in front of City property—and that there was no rational basis for the difference in this treatment. *See Olech*, 528 U.S. at 564; *Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018) ("An allegation that others are treated differently, without more, is merely a legal conclusion that we are not required to credit.").

Likewise, despite her belief that Sanchez led this alleged campaign against her, Plaintiff has failed to allege any facts connecting Sanchez—or any other named Defendant—to this allegedly discriminatory treatment. These conclusory assertions are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678.

Therefore, Plaintiff's § 1983 claims for deprivation of her Fourteenth Amendment equal protection rights against the named Defendants must be **DISMISSED**.

---

[8] With respect to the no-trespass orders in particular, Plaintiff's theory of liability of liability is unclear. It is also conceivable from the pleadings that she seeks to allege a retaliation claim for violation of her First Amendment rights.

### C.  Plaintiff's State-Law Claims

Plaintiff alleges that she was "illegally detained" (ECF No. 10 at 1, 3, 4) at Laurel Ridge and suffered "neglect and abandonment" (ECF No. 7 at 2) when she was released from University Hospital. The Court construes these as claims for false imprisonment and negligence under Texas law. Because the Magistrate Judge did not reach these claims in his Report and Recommendation, the Court address them here in the interest of clarity and completeness. These state-law claims against the Officers in their individual capacities must be dismissed, for several reasons.

To begin, as Defendant observe in their second motion to dismiss, Plaintiff's claim for negligence as to her release from University Hospital complains of conduct by police officers affiliated with SAPD, not the Pleasanton PD officers named in this action. *See* ECF No. 29 at 3. Similarly, although Plaintiff alleges that she was unlawfully detained at Laurel Ridge, she does not allege that any named Defendant was responsible for her detention. *See id.* at 5.

Even if Plaintiff could cure these defects, her claims against the officers in their individual capacities would fail under Section 101.106(f) of the Texas Tort Claims Act ("TTCA") because the officers' allegedly tortious conduct plainly occurred while they were acting in the scope of their employment. Entitled "Election of Remedies," section 101.106 provides:

> (f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under [the TTCA] against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem. Code § 101.106(f).

The election-of-remedies provision in section 101.106(f) of the TTCA requires courts to grant a motion to dismiss a lawsuit against a governmental employee sued in an official capacity

but allows the governmental unit to be substituted for the employee. in *Garza v. Harrison*, 574 S.W.3d 389, 393-94 (Tex. 2019). As defined in section 101.106(f), a governmental employee is effectively sued in an official capacity when the suit (1) is "based on conduct within the general scope of that employee's employment" and (2) "could have been brought under [the TTCA] against the governmental unit." *Id.* at 394. Even when the plaintiff purports to bring the claims against the employee in their individual capacity, as in *Garza*, the claims will be deemed official capacity claims subject to section 101.106(f) if these conditions are met. By adopting section 101.106(f), the Legislature has effectively mandated that only a governmental unit can be sued for a governmental employee's work-related tortious conduct. *Garza*, 574 S.W.3d at 393–94.

Section 101.106 alters the common-law scheme of employee tort liability and requires a plaintiff to decide at the outset whether an employee acted independently and is solely liable or acted within the general scope of her employment such that the governmental unit is vicariously liable. *Id.* at 399. The TTCA defines "scope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority." TEX. CIV. PRAC. & REM. CODE § 101.001(5). Section 101.106's scheme favors expedient dismissal of government employees when suit should have been brought against the government and "essentially prevents an employee from being sued at all for work-related torts and instead provides for a suit against the governmental employer." *Garza*, 574 S.W.3d at 399.

If the tortious conduct occurred within the general scope of the employee's employment and claims could have been brought against the governmental unit under the TTCA, then suit will only lie against the governmental unit.

Under the scope of employment prong, we ask whether there is a connection between the employee's job duties and the alleged tortious conduct. *Wilkerson v. Univ. of N. Tex.*, 878 F.3d 147, 159 (5th Cir. 2017). The TTCA "calls for an objective assessment of whether [an] employee was doing her job when she committed an alleged tort, not her state of mind when she was doing it." *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017); *see also Franka v. Velasquez*, 332 S.W.3d 367, 382 (Tex. 2011) ("[S]ection 101.106(f) . . . foreclose[s] suit against a government employee in his individual capacity if he was acting within the scope of employment."). Thus, even an intentional tort, such as false imprisonment, can fall within the scope of employment. *See Hundall v. Univ. of Tex. at El Paso*, No. EP-13-00365-DCG, 2014 WL 12496895 (W.D. Tex. Feb. 21, 2014). Although the City is immune from such claims—because Texas has not waived governmental immunity for intentional torts—Section 101.106(f) asks not whether a plaintiff can succeed on the merits, but whether her claim sounds in tort.[9] TEX. CIV. PRAC. & REM. CODE § 101.057(2); *Goodman v. Harris Cnty.*, 571 F.3d 388, 394 (5th Cir. 2009); *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001).

Here, the conditions of Section 101.106(f) are satisfied as to the false imprisonment alleged against the unidentified Pleasanton PD Officers and the negligence claim against SAPD Officer Torres. First, the officers were clearly acting in the scope of their employment in responding to Plaintiff's protest and collecting her from Laurel Ridge. Second, because Plaintiff's claims for false imprisonment sound in tort, they fall within the purview of the TTCA and should have been brought against the applicable government entities—the City of Pleasanton and the City of San Antonio—rather than against the individual officers.

---

[9] "In determining whether a claim could have been brought under [the TTCA] against the governmental unit, § 101.106(f), it does not matter that the [defendant] would be immune from suit." *Wilkerson*, 878 F.3d at 161–62 & n.16; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008) (subsection (f) is satisfied even if the governmental unit's immunity is not waived under the Tort Claims Act).

Given the nature of Plaintiff's state-law claims, however, it would be futile to permit Plaintiff to substitute either municipality as defendants in the case because the claims are barred by the doctrine of sovereign immunity. *See Wilkerson*, 878 F.3d at 158 ("Though Wilkerson alleges she acted in her personal capacity, Glazebrook gets governmental immunity.").

Claims arising out of "assault, battery, false imprisonment, or any other intentional tort" are excluded from the waiver of immunity under the TTCA. TEX. CIV. PRAC. & REM. CODE § 101.057. "If a plaintiff pleads facts which amount to an intentional tort, no matter if the claim is framed as negligence, the claim generally is for an intentional tort and is barred by the TTCA. A plaintiff cannot circumvent the intentional tort exception by couching his claims in terms of negligence." *City of Waco v. Williams,* 209 S.W.3d 216 (Tex. App.—Waco 2006, rev. denied). Further, Plaintiff's negligence claims against the City are barred under the TTCA for failure to provide notice to the City.[10]

Accordingly, Plaintiff's state-law tort claims against any officers in their individual capacities are barred under Section 101.106(f) and **DISMISSED WITH PREJUDICE**.

### D.  Leave to File a Second Amended Complaint

The Federal Rules of Civil Procedure permit liberal amendment of pleadings. Rule 15(a) provides that "a party may amend its pleading with . . . the court's leave" and that "[t]he court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Although a district court should generally give a plaintiff at least one chance to amend under Rule 15(a), it is within the sound discretion of the district court to deny a motion to amend when amendment would be futile. *See Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016) (While "the language of [Rule

---

[10] Plaintiff's claims appear to fall outside of the limited exceptions to this requirement involving property damage, personal injury for operation or use of a motor-driven vehicle/equipment or tangible personal or real property caused by a condition or use of such property. TEX. CIV. PRAC. & REM. CODE §§ 101.021, 101.101.

15(a)] evinces a bias in favor of granting leave to amend, . . . a district court need not grant a futile motion to amend.") (internal quotation marks and citations omitted). A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. *See Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 872–73 (5th Cir. 2000). In conducting this analysis, courts apply "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Id.* at 873 (quotation marks omitted).

Plaintiff has already been afforded multiple opportunities to amend her complaint. Nevertheless, the Court will grant Plaintiff a final opportunity to cure the deficiencies in her allegations as to the conditions of her 90-day pretrial confinement and her exclusion from City of Pleasanton property. Any amended pleading must specifically identify the official(s) involved and the statutory or constitutional provisions that were allegedly violated.

The Court concludes that all parties and the Court would benefit if an attorney were appointed to represent Plaintiff for the remainder of this case, and to ensure this case proceeds in a timely and orderly fashion, the Court appoints counsel to represent Plaintiff in this matter.

It is therefore **ORDERED** that Melissa Casey and MehaffyWeber, P.C., 4040 Broadway, Suite 522, San Antonio, Texas 78209, (210) 824-0009, are appointed to represent Plaintiff Lorraine Gonzales in this cause.

Plaintiff is required to keep counsel advised of any change in mailing address, telephone number, email address, or other contact information. Henceforth, any document submitted for filing on Plaintiff's behalf in this case must bear the signature of Plaintiff's counsel, and Plaintiff should not submit any pleading, motion, or other document for filing in this case unless it bears her counsel's signature, pending further order of the Court.

## CONCLUSION

For the foregoing reasons, the Court **ADOPTS** the Magistrate Judge's recommendation to dismiss Plaintiff's claims, and Defendants' motion to dismiss (ECF No. 15) is **GRANTED**.

It is **FURTHER ORDERED** that Defendants' second motion to dismiss (ECF No. 29) is **GRANTED**.

Should Plaintiff wish to proceed with her alleging a denial of adequate medical care during her 90-day pretrial confinement and unlawful exclusion from City property, she must, through appointed counsel, file a Second Amended Complaint ("SAC") **by no later than May 25, 2024**, or seek an extension of time to do so. The SAC must specifically identify the official(s) involved in each violation and the statutory or constitutional provisions that were allegedly violated.

Plaintiff's claims premised on all other theories of liability are **DISMISSED WITH PREJUDICE**.

The Clerk is **DIRECTED** to mail a copy of this Order to Lorraine Gonzales at 1102 N. Bryant Street, Pleasanton, Texas 78064.

The Clerk is further **DIRECTED** to add Melissa Casey as counsel of record and mail a copy of this Order to Melissa Casey, MehaffyWeber, P.C., 4040 Broadway, Suite 522, San Antonio, Texas 78209.

It is so **ORDERED**.

**SIGNED** this 25th day of March, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE